A–G–E CORPORATION, a South Dakota Corporation; Gerald Johnson, as Shareholder in A–G–E Corporation; J.H. Hilt Engineering, Inc., a South Dakota Corporation; Joe Hilt as Majority Shareholder in J.H. Hilt Engineering, Inc.; Mining Corporation, Inc., a Delaware corporation; John Williams, an employee of Mining Corporation, Inc.; William Ernest Simmons, a former employee of Mining Corporation, Inc.; The Associated General Contractors of South Dakota, Inc., a South Dakota corporation, Plaintiffs,

v.

UNITED STATES of America Acting By and Through the OFFICE OF MANAGEMENT AND BUDGET and The Department of Interior, Executive Branch Agencies and Richard G. Darman, the Director of the Office of Management and Budget and his successors in office, and Manual Lujan, Jr., the Secretary of the Department of Interior and his successors in office, Defendants.

Civ. No. 88–5130.

United States District Court,
D. South Dakota, W.D.

Nov. 29, 1990.

Ronald G. Schmidt, Gary F. Colwill, Mark A. Moreno, Schmidt, Schroyer, Colwill & Barnett, Pierre, S.D., for plaintiffs.

Tracy L. Merritt, Sandra M. Schraibman, Attys., Dept. of Justice, Civ. Div., Washington, D.C., Philip N. Hogen, U.S. Atty., Sioux Falls, S.D., for defendants.

## MEMORANDUM OPINION AND ORDER

BATTEY, District Judge.

Plaintiffs bring this action pursuant to the provisions of 28 U.S.C. § 1651 (diversity of citizenship), and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment). Jurisdiction is invoked under 28 U.S.C. § 1331 (federal question).

## NATURE OF CASE

### (a) General

This protracted and somewhat convoluted case has been before this Court since October 17, 1988. The case challenges Wyoming's geographical preference statutes which it asserts were authorized by the Office of Management and Budget through the October 1, 1988, revision to OMB Circular A–102 and the "Common Rule" which applies to the administration of federal grants to state and local governments.[1]

### (b) Parties

Plaintiff Associated General Contractors of South Dakota (AGC), a South Dakota corporation, has its headquarters at Pierre, South Dakota, and represents members, corporate and individual, engaged in the construction business (highway, utilities, and heavy construction). Its members from time to time are involved in construction work on federal aid projects in a multi-state area. Plaintiffs A–G–E Corporation (A–G–E) and J.H. Hilt Engineering, Inc. (Hilt) are two such members. A–G–E and Hilt have both completed work on federally-funded Abandoned Mine Land Reclamation (AMLR) projects in Wyoming. Plaintiffs Gerald Johnson and Joe Hilt are shareholders and officers of A–G–E and Hilt respectively. Plaintiff Mining Corporation, Inc. (MCI) of Lakewood, Colorado, is a Delaware corporation engaged in the business of construction in a multi-state area. MCI has completed four projects and prequalified as the bidder on other federally funded AMLR projects in the state of Montana in 1989. Plaintiff John Williams is an employee of MCI and William Ernest Simmons is a former employee of MCI.

The United States is a defendant through the agencies of the Office of Management and Budget (OMB) and the Department of Interior (Interior). Richard Darman and Manual Lujan, Jr., are also sued in their individual capacities as Director of OMB and Secretary of the Interior, respectively.

### (c) Prior Court History

In September of 1987, these claims were filed in the United States District Court, District of Wyoming, and two actions in the Wyoming state courts. The suits were attempts to challenge the use of preferences by the state of Wyoming in the procurement of contracts under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328 (SMCRA) which provided federal funds to states to reclaim surface mining sites. Both cases were dismissed shortly thereafter. *See J.H. Hilt Engineering, Inc. v. State of Wyoming,* Civil Docket 114, Number 349 slip op., First Judicial District, Laramie, Wyoming. *A–*

---

1. Circular A–102 "Uniform Requirements for Assistance to State and Local Governments" originally was promulgated in 1971 and amended from time to time. It established standards for federal agencies in administering grants to state and local governments. Attachment O to Circular A–102 established the standards and guidelines for the procurement of supplies, equipment, construction, and services for federal assistance programs. The standards were furnished to ensure that such materials and services were obtained efficiently and economi-

cally and in compliance with the provisions of applicable federal law and executive orders.

The "Common Rule" was adopted under direction of President Reagan as a rule governing the administration of federal grants to state and local governments. The twenty-four agencies of the federal government proposed the common rule in June 1987. 52 Fed.Reg. 21,820–862 (1987). The proposed common rule provided that in the area of procurement, states would expend and account for grant funds according to their own laws and preference (§ ___.36).

*G–E Corp. v. State of Wyoming,* Civ. No. C87–332–K, United States District Court, District of Wyoming.

After these cases were dismissed a similar action was brought in this Court on March 3, 1988, under SMCRA, to challenge the use of Wyoming's preference statute as applied to the SMCRA contracts involving federal funds. As the complaint was interpreted by this Court, the suit was brought under the citizens' suit provision in the SMCRA. As such, it was brought in the wrong venue, and was dismissed on May 2, 1988.[2] *A–G–E Corp. v. Hodel,* Docket # CIV87–5037, United States District Court, District of South Dakota, Western Division.

### (d) Current Case

From the date of the inception of this case, the procedural history[3] shows successive attempts on the part of plaintiffs to bring justiciable issues to the Court.

In the current action, Count I of the second amended complaint alleges that the defendants' adoption and application of Revised Circular A–102 and the Common Rule constitutes unauthorized action by the Executive Branch and violates separation of powers principles.

Count II alleges that Revised Circular A–102 and the Common Rule do not promote or advance federalism, but rather mandate or at the very least encourage states to violate the privilege and immunities clause (article IV, section 2, clause 1), the commerce clause (article I, section 8), the equal protection clause (amendment XIV, section 1), and the due process clause (amendment V).

Count III alleges that the acts are unlawful under 5 U.S.C. § 706 (judicial review of agency action) in that they are (1) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, (2) contrary to constitutional right, power, privilege, or immunity, and (3) in excess of statutory jurisdiction, authority, or limitations or short of statutory rights.

Count IV alleges that the adoption of the acts are contrary to the due process clause of the fifth amendment, including the equal protection component thereof.

Plaintiffs conclude with a prayer for relief requesting: (1) that a judgment be entered determining that the action in adopting Circular A–102 and the Common Rule constitutes unauthorized action by the Executive Branch; (2) the action does not promote or advance federalism, but encourages states to violate federal constitutional protections; (3) that a determination be made that the action of the defendants is unlawful under 5 U.S.C. § 706; (4) that a declaration be made that the action is contrary to the due process clause of the fifth amendment, including the equal protection component; (5) a permanent injunction prohibiting the defendants from continuing any action which allows any of the fifty

---

**2.** The citizens' suit provision of SMCRA, 30 U.S.C. § 1270, provides that any action brought respecting a violation of the Act may only be brought in the district in which the coal mining operation is located. 30 U.S.C. § 1270(a)(2).

**3.** December 19, 1988: OMB's Rules 12(b)(1) and 12(b)(6) motions under the Rules of Civil Procedure to dismiss for lack of jurisdiction and for the failure of the complaint to state a claim.

March 7, 1989: Order denying motion to dismiss.

September 28, 1989: Amended complaint adding additional parties plaintiff: Gerald Johnson, a shareholder in A–G–E Corporation, and Joe Hilt, as majority shareholder in J.H. Hilt Engineering Co.; and adding the Department of Interior as a party defendant.

November 3, 1989: Motion of government to dismiss plaintiffs' amended complaint or in the alternative for summary judgment.

February 23, 1990: Order denying motion for summary judgment.

April 17, 1990: Joint stipulation of facts.

May 7, 1990: Motion of plaintiffs for leave to amend complaint and add additional parties.

May 30, 1990: Order denying motion to amend complaint.

June 4, 1990: Motion of plaintiffs for reconsideration of Court's order denying plaintiffs' request to amend complaint.

August 2, 1990: Order granting motion for reconsideration and allowing filing of amended complaint to add parties.

August 6, 1990: Second amended complaint adding as parties plaintiff MCI, John Williams, and William Ernest Simmons.

August 17, 1990: Answer of defendants to plaintiffs' second amended complaint.

states or agencies thereof from using in-state geographical preferences in connection with federally-funded AMLR grants or procurements.

Plaintiffs specifically attack the Common Rule, § __.36(a) Procurement.[4] Plaintiffs contend that to permit the fifty states, each having somewhat different procurement policies and procedures, to use such procedures when administering federal funds on federal grant-in-aid projects violate their rights guaranteed by the United States Constitution.

Essentially, it is plaintiffs' contention that § __.36(a) is constitutionally defective because it relates to the states and requires them to follow the same policies and procedures it [a state] uses for procurement from its non-federal funds whereas other grantees and subgrantees are not so permitted.

Defendants' answer generally denies plaintiffs' allegations and raises jurisdictional and standing issues.

## I

## JOINT STIPULATION OF FACTS

The parties have stipulated certain facts and have provided affidavits for the consideration of the Court. The parties agree to the Court's disposition of the case based upon such submissions.

1. Plaintiff A–G–E Corporation is a corporation organized and existing under the laws of the state of South Dakota, is engaged in the business of construction in a multi-state area, and has its principal place of business in Fort Pierre, South Dakota.

2. Plaintiff J.H. Hilt Engineering, Inc. is a corporation organized and existing under the laws of the state of South Dakota, is engaged in the business of construction in a multi-state area, and has its principal

place of business in Black Hawk, South Dakota. J.H. Hilt Engineering, Inc. does primarily subcontract work and as such its interest in this case is the interest of a subcontractor.

3. Plaintiff Associated General Contractors of South Dakota (S.D. AGC) is a corporation organized and existing under the laws of the state of South Dakota. S.D. AGC is engaged, as a trade association, in the business of representing contractors doing construction work in a multi-state area, and has its principal place of business in Pierre, South Dakota.

4. Plaintiff Gerald Johnson is one of the shareholders and an officer of the A–G–E Corporation.

5. Plaintiff Joe Hilt is the majority shareholder and an officer of J.H. Hilt Engineering, Inc.

6. Defendant Office of Management and Budget (OMB) is an office in the Executive Office of the President of the United States.

7. Defendant Richard G. Darman is the duly appointed Director of OMB. In such capacity, Darman has his principal office in Washington, D.C. Defendant Darman or his predecessor in office is or was, at all times material to this action, the Director of OMB.

8. Defendant Department of the Interior (DOI) is an executive branch agency.

9. Defendant Manual Lujan, Jr. is the duly appointed Secretary of DOI ("Secretary") and in such capacity, has his principal office in Washington, D.C. Defendant Lujan or his predecessor in office is or was, at all times material to this action, the Secretary of DOI.

10. On August 3, 1977, the United States Congress passed Public Law 95–87,

---

**4.** § __.36(a) *States.* When procuring property and services under a grant, a State will follow the same policies and procedures it uses for procurement from its non-Federal funds.... Other grantees and subgrantees will follow paragraphs (b) through (i) in this section.

.    .    .    .    .

(c) *Competition.* (1) ... providing full and open competition ... and (2) ... in a manner that prohibits the use of statutorily or administratively imposed in-State or local geographical preferences....

91 Stat. 445, codified at 30 U.S.C. §§ 1201, *et seq.*, and popularly known as the Surface Mining Control and Reclamation Act of 1977 (the Act).

11. Title II, § 201 of the Act, 30 U.S.C. § 1211, established within the DOI, the Office of Surface Mining Reclamation and Enforcement (OSMRE); provided for the appointment of a director of the OSMRE ("Director"); and fixed the duties and responsibilities of the Secretary and of the Director.

12. Under the Act, the Secretary, acting through the OSMRE, shall, among other things:

(1) administer the programs for controlling surface coal mining operations which are required by this chapter; review and approve or disapprove State programs for controlling surface coal mining operations and reclaiming abandoned mined lands; make those investigations and inspections necessary to insure compliance with this [Act].

. . . .

(2) publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of this [Act];

. . . .

(4) administer the program for the purchase and reclamation of abandoned and unreclaimed mined areas pursuant to subchapter IV of this [Act] [30 U.S.C. §§ 1231, *et seq.*].

. . . .

(6) consult with other agencies of the Federal Government having expertise in the control and reclamation of surface mining operations and assist States, local governments, and other eligible agencies in the coordination of such programs;

. . . .

(9) assist the States in the development of State programs for surface coal mining and reclamation operations which meet the requirements of this chapter, and at the same time, reflect local requirements and local environmental and agricultural conditions;

. . . .

(12) cooperate with other Federal agencies and State regulatory authorities to minimize duplication of inspections, enforcement, and administration of this [Act]; and

(13) perform such other duties as may be provided by law and relate to the purposes of this [Act].

30 U.S.C. § 1211(c).

13. Title IV of the Act, 30 U.S.C. §§ 1231, *et seq.*, created the Abandoned Mine Reclamation Fund ("Fund"), *id.* § 1231; established the objectives of the Fund, *id.* § 1233; and provided for the manner by which states could promulgate and submit ·for approval a state reclamation plan and obtain grants from the Fund necessary to implement state reclamation programs, *id.* § 1235.

14. Thirty-five states, namely Alabama, Alaska, Arkansas, California, Colorado, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming have approved state programs and/or cooperative agreements with the DOI, by and through the OSMRE, for regulation and mining of federal lands under the Act. *See* 30 C.F.R. §§ 901–950.30 (1989).

15. In August 1982, the state of Wyoming, by and through its Department of Environmental Quality, Land Quality Division ("DEQ–LQD"), submitted a proposed state reclamation plan ("Wyoming Plan") to the Secretary pursuant to 30 U.S.C. § 1235 and 30 C.F.R. § 884. The proposed Wyoming Plan submitted by the DEQ–LQD and later approved by the Secretary and/or the OSMRE Director, contained, in accordance with the requirements set forth in 30 C.F.R. § 884.13, the following provisions:

1. *Purchasing and Procurement.*

The purchasing and procurement system utilized will conform to the requirements of OMB [Office of Management and Budget]

Circular A–102, Attachment O. Key elements of Attachment O are summarized in the following paragraphs:

Employees will neither solicit nor accept gratuities, favors, or anything of monetary value from contractors or potential contractors.

All procurement transactions regardless of whether negotiated or advertised and without regard to dollar value will be conducted in a manner so as to provide maximum open and free competition [sic].

Proposed procurement actions will be reviewed by the Administrator of the Land Quality Division to avoid purchasing unnecessary or duplicative items.

Invitations for bids or request for proposals will be based upon a clear and accurate description of technical requirements; such descriptions will not, in competitive procurements, contain features which unduly restrict competition.

Positive efforts will be made to utilize small business and minority-owned business sources of supplies and services. The type of procuring instruments used will be appropriate for each particular procurement. The "cost-plus-a-percentage of cost" method of contracting shall not be used.

Formal advertising, with adequate purchase description, sealed bids, and public openings, will be the method of procurement unless negotiated. Awards will be made to the responsible bidder whose bid is responsive to the invitation and is most advantageous to this agency.

Procurement will be negotiated if (1) public exigency will not permit delay, (2) the procurement is available from only one source, (3) the aggregate amount does not exceed $10,000, (4) the contract is for personal or professional services, or to be rendered by an education institution, (5) the source of procurement is outside the U.S., (6) no acceptable bids have been received after formal advertising, (7) purchasers are for highly specialized or unique merchandise, or (8) otherwise authorized by law, rules or regulations.

Contracts will be made only with responsible contractors who have the ability to perform the contract. Consideration will be given to integrity, past record of performance, financial and technical resources, and accessibility to other necessary resources.

Procurements in excess of $10,000 will be recorded with the following information: (1) if negotiated—justification for this procedure, (2) justification for contractor selection, and (3) the basis for the cost or price negotiated.

Contracts will be administered by assigned employees of this agency to assure contractor performance with terms, conditions, and specifications of the contract, and to assure adequate and timely follow-up of all purchasers.

Wyoming State Reclamation Plan (1982) at 36–40.

16. Following approval of the Wyoming Plan by the Secretary and/or the OSMRE Director, the DEQ–LQD, pursuant to 30 C.F.R. § 886.15, applied for grants from the Fund to accomplish abandoned mine land reclamation ("AMLR") within the state of Wyoming.

17. The DEQ–LQD was awarded grants of monies from the Fund to perform work in accordance with the Wyoming Plan and with applicable federal statutes and regulations. The monies received by the DEQ–LQD from the Fund are federal monies which are to be administered and disbursed by the DOI and the Secretary in accordance with applicable federal law.

18. Subsequent to the Secretary and/or OSMRE Director's approval of the Wyoming Plan, the DEQ–LQD published advertisements soliciting bids from contractors interested in performing AMLR work on projects with the state of Wyoming which had been approved by the Secretary and/or by the OSMRE Director.

19. Prior to July 1987, and for a period in excess of four years, all AMLR projects advertised, bid, administered and conducted by the DEQ–LQD contained qualifications for bidders based only upon experience, responsibility, financial and bonding capa-

bility, and availability of qualified personnel and equipment.

20. In June 1987, the DOI, by and through its Secretary and/or OSMRE Director, advised the state of Wyoming that it could apply its resident contractor and labor preferences laws, Wyo.Stat. §§ 16–6–101, *et seq.*, to federally funded AMLR projects in Wyoming.

21. In June 1987, but prior to the date stated in the bid advertisements published for construction projects identified generally as AML Project 12, the DEQ–LQD issued Addendum No. 1 to the specifications and contract documents for Wyoming AML Project 12 and modified these specifications and contract documents for all future projects to include reference to an application of Wyoming's resident contractors and labor preference laws.

22. The preference given to Wyoming resident contractors in public works projects, enacted in 1939, appears at Wyo. Stat. § 16–6–102 (1982):

Whenever a contract is let by the state, any department thereof or any county, city, town, school district or other public corporation of the state for the erection, construction, alteration or repair of any public building, or other public structure, or for making any addition thereto, or for any public work or improvement, the contract shall be let, if advertisement for bids is not required, to a resident of the state. If advertisement for bids is required, the contract shall be let to the responsible resident making the lowest bid if the resident's bid is not more than five percent (5%) higher than that of the lowest responsible non-resident bidder.

23. The following provision is contained at Wyo.Stat. § 16–6–108 (1982):

The operation of this Act [§§ 16–6–101 through 16–6–118] upon the letting of any public works contract above-mentioned, in connection with which, funds are granted or advanced by the United States of America, shall be subject to the effect, if any, related laws of the United States and valid rules and regulations of federal agencies in charge, governing use and payment of the federal funds.

24. The preference given to Wyoming resident laborers, enacted in 1971, in public works projects appears at Wyo.Stat. § 16–6–203 (1982):

Every person who is charged with the duty of construction, reconstructing, improving, enlarging, altering or repairing any public works project or improvement for the state or any political subdivision, municipal corporation, or other governmental unit, shall employ only Wyoming laborers on the project or improvement. Every contract let by any person shall contain a provision requiring that Wyoming labor be used except other laborers may be used when Wyoming laborers are not available for the employment from within the state or are not qualified to perform the work involved. The state employment office nearest the proposed contract or construction site shall maintain a list of laborers, classified by skills, who are residents and are available for employment. When the nearest state employment office is unable to provide the requested number of laborers from its own list, it shall immediately contract other state employment offices and request the names of other available laborers. Every person required to employ Wyoming laborers shall inform the nearest state employment office of his employment needs. If the state employment office certifies that the person's need for laborers cannot be filled from those listed as of the date the information is filed, then the person may employ other than Wyoming laborers.

25. The following provision is contained at Wyo.Stat. § 16–6–201 (1982):

This Act [§§ 16–6–201 through 16–6–206] shall not be enforced in a manner which conflicts with any federal statutes or rules or regulations.

26. After the issuance of Addendum No. 1 and the amendment of the Specifications and Contract Documents for future projects, the DEQ–LQD let out for bid various federally funded AMLR projects including the following:

1. AML 12, sites 52A, 52B, 52C;

2. AML 12, sites 44B, 52D;

3. AML 12, sites 32A, 32C;

4. AML 12, site 34A;

5. AML 12, sites 50A, 50B;

6. AML 12, sites 69, 70;

7. AML 12B, site 18; and

8. AML 12B, sites 24, 98.

27. The projects listed in paragraph 26 were awarded in 1987 or 1988, but before October 1, 1988. Plaintiff A–G–E Corporation or another South Dakota contractor was the low bidder on five of the projects specified in paragraph 26 (# 1, 5–8). A Colorado contractor was the lower bidder on three of the projects (# 2–4). These projects were awarded to Wyoming resident contractor whose bids were higher than the non-resident contractors' bids, but less than five percent higher.

28. Following the issuance of Addendum No. 1 and the amendment of the Specifications and Contract Documents for future projects, DEQ–LQD also let out for bid the below listed projects:

1. AML 12, site 34B;

2. AML 12, sites 42, 52E, 52F;

3. AML 12B, site 20;

4. AML 12B, site 22;

5. AML 12B, site 57; and

6. AML 12B, site 65.

29. Plaintiff A–G–E Corporation and other members of the South Dakota AGC were awarded the projects listed in paragraph 28.

30. In 1987 and 1988, but prior to October 1, 1988, DOI has authorized the expenditure of federal monies on AMLR projects where resident state contractors were awarded the projects even though the resident contractor's bid was higher than the bid submitted by a non-resident contractor.

31. At the time that the projects listed in paragraphs 26 and 28 were let out for bid and awarded, the version of OMB Circular A–102 and the common rule that are challenged in this action were not in existence.

32. OMB Circular A–102, "Uniform Requirements for Assistance to State and Local Governments," originally was promulgated in 1971 and established standards for federal agencies in administering grants to state and local governments.

33. Attachment O to Circular A–102 established the standards and guidelines for the procurement of supplies, equipment, construction, and services for federal assistance programs. The standards were furnished to insure that such materials and services were obtained efficiently and economically and in compliance with the provisions of applicable federal law and executive orders.

34. Section 2b of Attachment O provided:

Grantees [states] shall use their own procurement procedures which reflect applicable State and local laws and regulations, provided that procurement for Federal Assistance Programs conform to the standards set forth in this Attachment and applicable Federal law.

35. Section 10 of Attachment O provided in pertinent part:

All procurement transactions, regardless of whether by sealed bid or by negotiation and without regard to dollar value, shall be conducted in a manner that provided maximum open and free competition consistent with this attachment. Procurement procedures shall not restrict or eliminate competition. Example of what is considered to be restrictive of competition include, but are not limited to: (1) placing unreasonable requirements on firms in order for them to qualify to do business: (2) noncompetitive practices between firms; (3) organization conflicts of interest and (4) unnecessary experience in bonding requirements.

36. Section 11 of Attachment O stated in part:

b. In competitive sealed bids (formal advertising), sealed bids are publicly solicited and a firm-fixed-price contract (lump sum or unit price) is awarded to the responsible bidder whose bid, conforming with all the materials, terms, and conditions of the invitation for bids, is lowest in price.

. . . .

(2) If formal advertising is used for a procurement under a grant, the following requirements shall apply:

. . . .

(d) A firm-fixed price [sic] contract award shall be made by written notice to that responsible bidder whose bid, conforming to the invitation for bids, is lowest.

37. On March 12, 1987, President Reagan directed that Circular A–102 be revised to "reflect developments consistent with our Federalism policies and State and local regulatory relief objectives and the President's management improvement program." 53 Fed.Reg. 8034 (Mar. 11, 1988).

38. The Office of Management and Budget (OMB) issued a revised version of OMB Circular A–102 on March 11, 1988. 53 Fed. Reg. 8028–8032 (Mar. 11, 1988). It is this Circular that is challenged in this action.

39. The revised Circular "establishes consistency and uniformity among federal agencies in the management of grants and cooperative agreements with state, local and federally recognized Indian tribal governments" and supersedes the prior version of OMB Circular A–102 and Attachment O. *Id.* at 8029.

40. Revised OMB Circular A–102 does not address the procedures to be followed by states and local governments in administering federal grants. 53 Fed.Reg. 8029 (Mar. 11, 1988).

41. Revised OMB Circular A–102 does not describe, determine, or mandate the substance of state procedures to be followed in awarding federal aid projects. Plaintiffs' Answers to Defendants' First Interrogatories and Request for Production of Documents at 6–7 (attached to Defendants' Memorandum in Support of its Motion to Dismiss Plaintiffs' Amended Complaint or, in the Alternative, for Summary Judgment as Exhibit 1).

42. Revised OMB Circular A–102 does not require the states to adopt local geographic preferences in awarding federal aid projects. Plaintiffs' Answers to Defendants' First Interrogatories and Request for Production of Documents at 8.

43. The authorities cited for the issuance of revised Circular A–102 are as follows: (1) the Budget and Accounting Act of 1921, as amended; (2) the Budget and Accounting and Procedures Act, of 1950, as amended; (3) Reorganization Plan No. 2 of 1970; and (4) Executive Order 11541. 53 Fed.Reg. 8029 (Mar. 11, 1988).

44. In concert with the revision of Circular A–102, President Reagan directed that all affected federal agencies propose and adopt a common rule governing the administration of federal grants by state and local governments. 53 Fed.Reg. 8034 (Mar. 11, 1988).

45. DOI and 22 other federal agencies proposed a common rule in June 1987. 52 Fed.Reg. 21820–21862 (June 9, 1987). Consistent with the President's Federalism Executive Order, the proposed rule provided that in the area of procurement, "States will expend and account for grant funds according to their own laws and procedures." 53 Fed.Reg. 8035 (Mar. 11, 1988).

46. Twenty-four federal agencies, including DOI, issued a common rule on March 11, 1988. OMB was not one of the twenty-four agencies that issued this rule. 53 Fed.Reg. 8087–8103 (Mar. 11, 1988). OMB was involved in the preparation of the common rule in the manner described at 53 Fed.Reg. 8034–36 (Mar. 11, 1988).

47. The common rule was codified with minor revisions in DOI's title of the Code of Federal Regulations. 43 C.F.R. §§ 12.-41, *et seq.* (1988). The provision of the common rule challenged in this action (§ ___.36) is contained in DOI's codification of the common rule. 43 C.F.R. § 12.76.

48. The common rule addresses the administration of federal grants and cooperative agreements by state and local governments. 53 Fed.Reg. 8088 (Mar. 11, 1988).

49. The common rule contains the following provision:

§ ___.36 Procurement

(a) States. When procuring property and services under a grant, a State will follow the same policies and procedures it uses for procurements from its non-Federal funds . . . Other

grantees and subgrantees will follow paragraphs (b) through (i) in this section.

. . . .

(b) Procurement Standards. (1) Grantees and subgrantees will use their own procurement procedures which reflect applicable state and local laws and regulations, provided that the procurements conform to applicable federal law and the standards identified in this section.

(c) Competition. (1) All procurement transactions will be conducted in a manner providing full and open competition consistent with the standards of Section ___.36.

(2) Grantees and subgrantees will conduct the procurements in a manner that prohibits the use of statutorily or administratively imposed in-state or local geographical preferences in the evaluation of bids or proposals, except in those cases where applicable federal statutes expressly mandate or encourage geographical preferences.

53 Fed.Reg. 8086–8097 (Mar. 11, 1988).

50. The common rule, as codified by the twenty-four agencies, applies to grants and cooperative agreements with state, local, or federally-recognized Indian tribal governments awarded on or after October 1, 1988. DOI's codification of the common rule applies to federally-funded AMLR projects awarded on or after October 1, 1988.

51. The common rule does not require the states to enact local geographic preference laws.

52. The states of Montana, New Mexico, Alaska, and Arkansas are required under state law to apply their resident contractor and/or laborer preference laws to state public procurement. *See* Mont.Code Ann. § 18–1–102 (Supp.1989); N.M.Stat. Ann. § 13–1–201 (Supp.1989) [sic]; Alaska Stat. § 36.30.005, *et seq.* (Supp.1989); Ark. Code Ann. § 22–9–206 (Supp.1989). South Dakota has a reciprocal resident bidder and labor preference law which applies to bidders and laborers from a state which enforces or has a resident bidder preference law. *See* S.D.Codified Laws Ann. § 5–19–1, *et seq.* (Supp.1989).

53. OMB has stated that under § ___.36 of the Common Rule, "federal funds in a State will be subject to the same procurement requirements as State funds in that State, including State geographical preferences, if any." Letter from James C. Miller, III, Director of OMB, to Senator Tom Daschle (May 17, 1988).

54. DOI, through the OSMRE Director, has stated that the proposed revision to Circular A–102 "merely clarifies that a state should follow the same policies and procedures for procurements with federal funds as it uses for procurements from its non-federal funds."

55. As of February 12, 1988, DOI stated that nine states (Alabama, Alaska, Arizona, Arkansas, California, Massachusetts, Montana, New Mexico, and Wyoming) had resident preference statutes that were part of the state procurement procedure. Letter from Jed D. Christensen to Senator Tom Daschle (Feb. 12, 1988).

56. OMB has expressed its view that state and local geographical preferences are inconsistent with the free and open competition provisions of OMB Circular A–102, Attachment O. Furthermore, OMB has stated that in the area of procurement, state grantees, as opposed to other grantees, are treated differently under the common rule. Letter from Gordon B. Wheeler to Senator Tom Daschle (Oct. 21, 1987).

57. DOI has not issued a formal written determination as to whether DOI's codification of ___.36 of the common rule mandates states which use in-state geographical preferences as a matter of law or policy and procedure in non-federally funded procurements.

58. DOI has not issued a formal written determination as to whether DOI's codification of ___.36 of the common rule allows states which use in-state geographical preferences as a matter of law or policy and procedure in non-federally funded procurements discretion in deciding whether to apply geographical preferences to federally funded procurements.

The Court finds the following additional facts based upon the affidavits submitted:

1. Mining Corporation, Inc., is a corporation organized and existing under the laws of the state of Delaware, is engaged in the business of construction in a multi-state area and has its principal place of business in Lakewood, Colorado. Mining Corporation, Inc. has competed for and prequalified as a bidder on at least one federally funded AMLR project in the state of Montana in 1989.

2. John Williams is an employee of Mining Corporation, Inc. and as such has a direct interest in matters involving the corporation. He also has a personal interest in the outcome of the instant proceedings.

3. William Ernest Simmons is a former employee of Mining Corporation, Inc. and had an interest in matters involving the corporation from 1974 through 1989. He also has a personal interest in the proceedings herein.

## II

### OMB—CIRCULAR A–102

#### (a) Background of Circular A–102 and the Common Rule

The President's Council on Management Improvements (PCMI) was established to review existing guidance for management of federal aid programs. OMB published a notice in the Federal Register (49 Fed.Reg. 24,958) announcing the review and seeking public comments on over fifty issues and possible options for each. Federal agencies, states, local governments, interest groups, business organizations, and non-profit organizations, as well as members of Congress, submitted comments concerning the revision. The result was a revised OMB circular [102] addressed solely to federal agencies and a "common" government-wide regulation—addressed to state and local grantees.

Circular A–102 was adopted by OMB pursuant to Executive Order 12372, reprinted at 31 U.S.C. § 6506 (Supp.1988). It was revised March 11, 1988 (53 Fed.Reg. 8028–32). The title of the circular was "Office of Management and Budget—Grants and Cooperative Agreements with State and Local Governments."

#### (b) Specific Provisions

OMB issued Circular A–102 to the "Heads of Executive Departments and Establishments" on the subject of "Grants and Cooperative Agreements with State and Local Governments." 53 Fed.Reg. 8029 (1988). The Circular provided in part as follows:

1. *Purpose.* This Circular establishes consistency and uniformity among Federal agencies in the management of grants and cooperative agreements with State, local, and federally recognized Indian tribal governments. This revision supersedes Office of Management and Budget (OMB) Circular A–102 dated January 1981.

2. *Authority.* This Circular is issued under the authority of the Budget and Accounting Act of 1921, as amended; the Budget and Accounting Procedures Act of 1950, as amended; Reorganization Plan No. 2 of 1970; and Executive Order 11541. Also included in the Circular are standards to ensure consistent implementation of sections 202, 203, and 204 of the Intergovernmental Cooperation Act of 1968, the Office of Federal Procurement Policy Act Amendments of 1983, and sections 6301–08, title 31, United States Code.

3. *Background.* On March 12, 1987, the President directed all affected agencies to issue a grants management common rule to adopt government-wide terms and conditions for grants to State and local governments. This revised Circular provides guidance to Federal agencies on business-like management of grant programs and other matters not covered in the common rule. The revision replaces and rescinds Circular A–102, dated January 1981, including Attachments A–P.

4. *Coverage.* Consistent with their legal obligations, all Federal agencies administering programs that involve grants and cooperative agreements with State, local, and Indian tribal governments

(grantees) shall follow the policies in this Circular and issue a common grants management rule (common rule).

Clearly by its very terms, Circular A–102 applied to the actions of federal agencies in the management of grants and cooperative agreements with states and local governments.

### III

### COMMON RULE

#### (a) Background

The Common Rule represents a finalized rule effective October 1, 1988, to establish consistency and uniformity among the federal agencies.[5] The rule was the result of a twenty-four agency task force under PCMI chaired by OMB and established to explore streamlining grants management and review of OMB Circular A–102. Circular A–102 originally was a circular which related to uniform administrative requirements for grants to state and local governments. Various federal agencies, state, local governments, interest groups, business organizations, and nonprofit organizations, as well as members of Congress, submitted several hundred comments.

The Common Rule, as well as Circular A–102, was based upon information and assistance from governmental and nongovernmental groups. The proposed Common Rule contained fiscal and administrative requirements for grants to state and local governments (grantees) and subrecipients which are state and local governments (subgrantees). At the same time, OMB and the agencies prepared a revised Circular A–102, directed solely to federal agencies, containing guidance to federal agencies on how they should manage the award and administration of federal grants.

The Common Rule was to replace the numerous agency implementing directives, regulations, and manuals that had arisen in implementation of Circular A–102. The impetus behind Circular A–102 and the Common Rule was to provide a more standardized and efficient approach to the administration of the federal assistance programs and to create a certain environment for state and local governments to reflect the administration's policy on federalism as regards such grants.[6] Consistent with the President's federalism executive order, the proposed Common Rule provided that in three important areas (financial management systems, § __.20; equipment, § __.32; and procurement, § __.36), states will expend and account for grant funds according to their own laws and procedures. This flexibility for states in these areas applies only to funds expended by the state itself. The rule is published in 53 Fed.Reg. 8087–103 (1988).

#### (b) Specific Provisions

The Common Rule, with respect to procurement, provides as follows:

§ __.36 *Procurement.*

(a) *States.* When procuring property and services under a grant, a State will follow the same policies and procedures it uses for procurements from its non-Federal funds. The State will ensure that every purchase order or other contract includes any clauses required by Federal statutes and executive orders and their implementing regulations. Other grantees and subgrantees will fol-

---

5. Department of Agriculture; Department of Commerce; Department of Defense; Department of Education; Department of Energy; Department of Health and Human Services; Department of Housing and Urban Development; Department of the Interior; Department of Justice; Department of Labor; Department of State; Department of Transportation; ACTION; Commission on the Bicentennial of the United States Constitution; Environmental Protection Agency; Federal Emergency Management Agency; Federal Mediation and Conciliation Service; Institute of Museum Services; National Archives and Records Administration; National Endowment for the Arts; National Endowment for the Humanities; National Science Founda-

tion; Small Business Administration; Veterans Administration. 53 Fed.Reg. 8034 (1988).

6. As explained in Executive Order 12612, States possess unique constitutional authority, resources, and competence. Under federalism, States should be given the maximum administrative discretion possible with respect to national programs they administer. Intrusive, federal oversight is neither necessary nor desirable. Federal agencies should refrain from establishing uniform, national standards, and where possible, defer to the States to establish them. 53 Fed.Reg. 8035 (1988).

low paragraphs (b) through (i) in this section.

(b) *Procurement standards.* (1) Grantees and subgrantees will use their own procurement procedures which reflect applicable State and local laws and regulations, provided that the procurements conform to applicable Federal law and the standards identified in this section.

.    .    .    .    .

(c) *Competition.* (1) All procurement transactions will be conducted in a manner providing full and open competition consistent with the standards of § __.36. Some of the situations considered to be restrictive of competition include but are not limited to....

2. Grantees and subgrantees will conduct procurements in a manner that prohibits the use of statutorily or administratively imposed in-State or local geographical preferences in the evaluation of bids or proposals, except in those cases where applicable Federal statutes expressly mandate or encourage geographic preference. Nothing in this section preempts State licensing laws. When contracting for architectural and engineering (A/E) services, geographic location may be a selection criteria provided its application leaves an appropriate number of qualified firms, given the nature and size of the project, to compete for the contract.

## IV

## DISCUSSION

The Court believes it would be helpful to further distill the facts.

Essentially, plaintiffs South Dakota and Colorado parties are engaged generally in the bidding on multi-state contracting projects. Specifically, they have in the past and do intend in the future to bid on Abandoned Mine Land Reclamation projects (AMLR) in the state of Wyoming. They have been successful bidders in the past and were it not for Wyoming's bidder preference law as countenanced by the Common Rule, they would submit bids on future contracts. It is plaintiffs' position that the Common Rule, issued by twenty-four federal agencies of the federal government, requires states, including the state of Wyoming, to apply their policies and procedures for procuring goods and services where federal grant money is involved. Such application is alleged to be chilling to the free and open competition for such projects. At the bottom line this is an indirect attack upon Wyoming state bidder preference laws. Direct attacks have resulted in prior failure in Wyoming.[7]

This Court early on entertained doubt as to whether the plaintiffs possessed standing to pursue their claims against defendants OMB and DOI. Nonetheless, in the posture of deciding a motion to dismiss brought by the defendants under Fed.R.Civ.P. 12(b)(1) (lack of jurisdiction over the subject matter) and Fed.R.Civ.P. 12(b)(6) (failure to state a claim upon which relief can be granted) this Court, on March 7, 1989, denied defendants' motion to dismiss and permitted the action to proceed.[8] Having now permitted the plaintiffs to further pursue their claims, the "other day" referred to by the Court in its March 7, 1989

7. *State v. Antonich,* 694 P.2d 60 (Wyo.1985).

8. In the memorandum decision of March 7, 1989, the Court stated in part as follows:

Defendants' motion challenges plaintiffs' claims under article III, section 2 of the Constitution, which limits the judicial power of the federal courts to the resolution of "cases" and "controversies." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The Court follows the standard that:

for purposes of ruling on this motion to dismiss, the Court must accept as true all materi-

al allegations of the complaint, and must construe the complaint in favor of the complaining party. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). *Defenders of Wildlife v. Hodel,* 658 F.Supp. 43 (D.Minn.1987).

.    .    .    .    .

Plaintiffs have sufficiently pled their cause of action to survive defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (6). The question of whether plaintiffs' case will survive a motion for summary judgment must await another day.

order has arrived. The Court now finds that the plaintiffs lack standing to pursue their claims and accordingly, the plaintiffs' second amended complaint is dismissed.

## V

### STANDING

A brightline case on standing is *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *see also Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Standing under the Constitution is a function of the article III "cases or controversies" language.

■ Before a party has standing to have his case heard by a federal court, it must be shown that three criteria have been met. First, one must prove that an actual or threatened injury has been suffered. Second, the injury must be fairly traceable to the alleged illegal conduct (causation requirement). Third, it must be likely that the injury will be redressed by the requested relief (the redressability requirement). *Mideast Sys. & China Civil Constr. v. Hodel*, 792 F.2d 1172, 1176 (D.C.Cir.1986) citing *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 785, 70 L.Ed.2d 700 (1982); *see also Defenders of Wildlife v. Hodel*, 851 F.2d 1035, 1038 (8th Cir.1988).

■ The article III cases or controversy limitation on a court's power requires that a plaintiff suffer a "distinct and palpable" injury that gives one a personal stake in the outcome of the litigation. *Mideast Sys.*, 792 F.2d at 1176, citing *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). *Mideast Systems* continues to point out that the injury must be more than conjectural or hypothetical; it cannot be a generalized grievance shared by all or a large class of citizens. *Id.* at 1176.

The Eighth Circuit, in discussing the doctrine of standing, has said that standing relates "to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Defenders of Wildlife v. Hodel*, 851 F.2d 1035, 1038 (8th Cir.1988) citing *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C.Cir.1982) (Bork, J., concurring), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983). Thus standing does not appear to this Court to be an intractable rule which one would conjure in order to avoid deciding the merits of a case.

This circuit has applied the concept of standing in a number of recent cases. *Roberts v. Wamser*, 883 F.2d 617 (8th Cir. 1989) (unsuccessful candidate attempting to challenge election results does not have standing under the Voting Rights Act); *Women's Health Center of W. County, Inc. v. Webster*, 871 F.2d 1377 (8th Cir. 1989) (physician lacks standing under Missouri's abortion statutes); *Pulido v. Bennett*, 860 F.2d 296 (8th Cir.1988) (federal taxpayers have standing to bring establishment clause challenge to Department of Education's funding of services provided by parochial schools); *Defenders of Wildlife v. Hodel*, 851 F.2d 1035 (8th Cir.1988) (environmental organizations had standing to challenge Department of Interior's final regulation concerning projects on endangered species of wildlife or plants); *United Food & Commercial Workers Int'l v. I.B.P., Inc.*, 857 F.2d 422 (8th Cir.1988) (unions and union officials have standing to challenge validity of Nebraska picketing statutes); *Steele v. Van Buren Pub. School Dist.*, 845 F.2d 1492 (8th Cir.1988) (parents have standing under the establishment clause to challenge band teacher's prayer sessions); *Sioux Falls Cable Television v. South Dakota*, 838 F.2d 249 (8th Cir.1988) (cable television distributor had standing to bring action under Cable Communications Policy Act); *Arkansas v. Block*, 825 F.2d 1254 (8th Cir.1987) (state has standing to challenge Secretary of Agriculture's designation of county as reporting unit for purposes of calculating

state's food stamp mail loss rate under department's regulations).

Before applying the specific predicates to standing of (1) injury, either actual or threatened (injury in fact); (2) fairly traceable (causation); and (3) likely to be redressed (redressability), it is necessary to examine the precise application of Revised Circular A–102, effective October 1, 1988, and the Common Rule.

### (a) Circular A–102 and Attachment O Prior to October 1, 1988

Prior to July 1987 and for a period in excess of four years, all the AMLR projects which had been advertised and administered in Wyoming by DEQ–LQD were let based upon experience, responsibility, financial, and bonding capacity, and the availability of qualified personnel and equipment. In June of 1987, DOI, by and through OSMRE, advised the state of Wyoming that it could apply its resident contractor and labor preference laws Wyoming statute § 16–6–101 *et seq.* to federally funded AMLR projects in Wyoming. About that time AMLR Project 12 was under consideration. DEQ–LQD issued Addendum No. 1 to the specifications and contract documents for this project, modifying the specifications to provide that in all future projects a reference to the application of Wyoming's resident contractors and labor preference laws should be included.

These Wyoming preference laws generally provided for a five percent residential bidder preference which provided that a contract shall be let to the responsible resident making the lowest bid if the resident's bid is not more than five percent higher than that of the lowest responsible nonresident bidder. Stipulation of Facts 19–22. The Wyoming bidder preference law also applied in the hiring of Wyoming resident laborers. Stipulation of Facts 24. Both the Wyoming bidder preference law and the Wyoming resident laborers preference statute provided that upon the letting of any public works contract where grant

funds from the government are used, such contract shall be subject to the United States rules and regulations of federal agencies in charge governing the use and payment of the federal funds and provided further that any provisions of the Wyoming preference statutes shall not be enforced in a matter which conflicts with federal statutes or rules or regulations.[9] Stipulations of Facts 23 and 25.

During 1987 and 1988, but prior to October 1, 1988, plaintiff A–G–E Corporation was one of five nonresident corporations bidding on AMLR sites in the state of Wyoming. A Colorado contractor was the bidder on three projects during this period of time. All eight projects were awarded to Wyoming resident contractors whose bids were higher than the nonresident contractors' bid, but less than five percent higher. DOI authorized the expenditure of federal monies on these AMLR projects, even though the resident state contractors were awarded the projects where the bid was higher than the bid submitted by the nonresident contractor. Stipulation of Facts 26, 27, and 30.

### (b) OMB Circular A–102 and the Common Rule Subsequent to October 1, 1988.

OMB Circular A–102, as revised March 11, 1988, effective October 1, 1988, established consistency and uniformity among federal agencies in the management of grants and cooperative agreements. The Common Rule, which superseded Attachment O, establishes the standards and guidelines for the procurement of supplies, equipment, construction, and services for federal assistance programs directed to grantees and subgrantees other than states. States are directed in the Common Rule to follow their own procurement policies and procedures under federal assistance programs. Specifically, the Common Rule was codified at 43 C.F.R. § 12.41, Subpart C, Uniform and Administrative Requirements for Grants and Cooperative

---

**9.** This Act [§§ 16–6–201 through 16–6–206] shall not be enforced in a manner which conflicts    with any federal statutes or rules or regulations.

Agreements to State and Local Governments.

43 C.F.R. Subtitle A (10–1–89 ed.), § 12.76, provides as follows:

§ \_\_.36 Procurement

(a) **States.** When procuring property and services under a grant, a State will follow the same policies and procedures it used for procurements from its non-Federal funds ... Other grantees and subgrantees will follow paragraphs (b) through (i) in this section.

. . . .

(b) **Procurement Standards.** (1) Grantees and subgrantees will use their own procurement procedures which reflect applicable state and local laws and regulations, provided that the procurements conform to applicable federal law and the standards identified in this section.

(c) **Competition.** (1) All procurement transactions will be conducted in a manner providing full and open competition consistent with the standards of Section 12.76 [\_\_.36].

(2) Grantees and subgrantees will conduct the procurements in a manner that prohibits the use of statutorily or administratively imposed in-state or lo-cal geographical preferences in the evaluation of bids or proposals, except in those cases where applicable federal statutes expressly mandate or encourage geographical preferences.

53 Fed.Reg. 8086–97 (1988).

By the very wording set forth above, states are required to follow their own policies and procedures that are followed for procurements from its nonfederal funds. Wyoming thus, would be permitted, indeed mandated, to use its geographical contract and labor preference laws. Other grantees, such as local governments, including county, borough, municipality, city, town, township, parish, local public authority, special district, school district, interstate district, council of governments, Indian tribe, and any other instrumentality of local government, defined at 43 C.F.R. § 12.16, continue to be required by section \_\_.36(c)(2) to conduct procurements (contracts) so as to not apply such geographical preferences. The only exception would be where applicable federal statutes expressly mandate or encourage geographical preferences. Stipulation of Facts 47–49, and 53.

A letter from James C. Miller III, Director, OMB, dated May 17, 1988, set forth with clarity the position of OMB.[10]

10. Letter dated May 17, 1980, James C. Miller III, Director, OMB, to Senator Tom Daschle, United States Senator, State of South Dakota, cited in part as follows:

On March 12, 1987, the President directed all Federal agencies to adopt a government-wide "common rule" to replace agency implementation of Circular A–102, "Uniform Administrative Requirements for Grants to State and Local Governments." The President's memorandum directed the new common rule "to reflect developments consistent with our Federalism policies and State and local regulatory relief objectives."

On June 9, 1987, the Federal agencies proposed a government-wide common rule. Changes consistent with our Federalism policy were one of the three principal issues on which the public comment was invited. The public supported the proposed changes. The General Accounting Office was supportive as well, pointing out that "This policy would provide greater flexibility to States to standardize the management of related State and Federal programs. The policy also recognizes the improvements made by many States in recent years to upgrade their management systems and personnel."

Consistent with the President's Federalism principles, the agencies proposed that States expend and account for grant funds in accordance with the financial management, property and procurement laws and procedures applicable to their own funds. As explained on page 8035 of the preamble to the final rule published on March 11, 1988 (copy enclosed), States possess unique constitutional authority, resources and competence. Under Executive Order 12612, "Federalism," of October 26, 1988 (copy enclosed), States should be given the maximum administrative discretion possible with respect to the national programs they administer. Any regulatory preemption of State law should be restricted to the minimum level necessary to achieve the objectives of the Federal programs. Federal agencies should refrain from establishing uniform, national standards and, where possible, defer to the States to establish them.

Under Section \_\_.36 of the common rule, Procurement, when States procure goods and services under grant programs, they will not be subject to Federal standards which would

■ Turning then to the application of the factors to be considered by this Court in its determination of the issue of standing, the Court does find that there is injury, either actual or threatened; however, the Court finds the injury to plaintiffs is not fairly traceable nor is it likely to be redressed by an order and judgment of this Court. Standing, therefore, does not exist.

1. *Injury, Either Actual or Threatened (Injury in Fact).*

In this case the government regulations, mandated by OMB Circular A–102 and the Common Rule, mandate that Wyoming use its own procedures to regulate the awarding of contracts using federal grant funds. The plain words of section ___.36(a) [43 C.F.R. Subpart a, § 12.76], are phrased in mandatory language. The regulations state that, "When procuring property and services under a grant, a state *will* follow the same policies and procedures it uses for procurement from its non-federal funds." (Emphasis provided.) The use of the term "will" indicates that this is a mandatory requirement. Black's Law Dictionary, 5th ed., page 1433, states that "will" is "an auxiliary verb commonly having a mandatory sense of 'shall' or 'must.' It is a word of certainty, while the word 'may' is one of speculation and uncertainty." The fact that the regulations use the word "will" rather than "shall" seems to the Court to be of no legal significance. The word "shall" appearing in a statute as a general rule implies that whatever shall be done is mandatory. *Escoe v. Zerbst,* 295 U.S. 490, 493, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1935).

In determining the meaning of the word "will," the Court also considers the fact that the purpose and aim of section ___.36 of the Common Rule was to advance the

President's concept of federalism to the end that the states will follow their own policies and procedures as respects to procurements and contracts, even though the funding is federal funding. To construe the regulation as permissive only would not satisfy the aims of federalism sought to be addressed by the regulations. Such a construction would permit a state to defeat the President's concept of federalism by merely exercising its permissive authority. The plain effect upon the plaintiffs is obvious when one considers their past and future intent in obtaining contractual construction work under the Abandoned Mine Reclamation Programs pursued by the state of Wyoming. Contracts were lost in the past and it may reasonably be anticipated will be lost in the future by reason of the application of the Wyoming preference system.

The Court also has considered whether or not the Common Rule applies to the plaintiffs in such an indirect manner as to preclude this Court's finding of injury in fact. In *Defenders of Wildlife v. Hodel,* 851 F.2d 1035, 1039 (8th Cir.1988), the court addressed the situation in cases where the government acts directly against a third party whose expected response in turn will injure the plaintiff. Citing *Wilderness Society v. Griles,* 824 F.2d 4, 11 (D.C.Cir.1987). This is essentially what is involved here. The action of the federal agency DOI as applied by the state of Wyoming injures the plaintiffs. Such indirect action nonetheless would confer standing under the first prong of *Valley Forge.* Thus, this Court finds that the first prong to standing has been met.[11]

2. *Fairly Traceable and Likely to be Redressed.*

The question of whether the injury to the plaintiffs is fairly traceable raises a causa-

---

preempt State law and procedures. This means that Federal funds in a State will be subject to the same procurement requirements as State funds in that State, including State geographic preferences, if any. This result is consistent with our Federalism policy which permits diversity in the public policies adopted by States, and refrains from the Federal Government's restricting the policy-making discretion of the States.

11. The Court has not discussed the prudential limitation to standing. It is clear that the federal regulations under consideration and the injury sought to be redressed satisfy prudential requirements. *See, e.g., Defenders of Wildlife* at 1039; *see also Association of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); and *Clark v. Securities Indus. Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

tion issue. In this connection the Court must determine whether or not the action of the government agency is such that there is a nexus between that conduct and the injury of which complaint is made.

The parties agree that Circular A–102 and the Common Rule do not require the states to adopt local geographical preferences in awarding federal aid projects. Stipulation of Facts 42. While it is true that states are required to use their own policies and procedures (geographical preferences where they exist), this is not the same as requiring states to adopt geographical preference statutes. This Court finds that it is the Wyoming preference statute which causes plaintiffs' threatened injury, and not the existence of the federal regulations.

Should Wyoming decide in its wisdom to change its preference statutes or to rescind them altogether, the existence of the federal regulations as they now exist would not cause injury to plaintiffs. Thus, the Court concludes that any injury to plaintiffs is not fairly traceable to these regulations.

Similarly, a judgment of this Court invalidating the regulations as they may relate to geographical preferences would not affect the Wyoming geographical preference statutes. Thus, the harm sought to be remedied cannot be redressed by this Court. In *Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172 (D.C.Cir.1986), the District of Columbia Circuit discussed the concept of causation on the issue of standing. The Court found that the nexus between the failure of DOI to require certain ethical bidding rules causing an improper rejection of a bid submitted for the construction of a hospital facility on Saipan was too attenuated to sustain standing. So too this Court finds that the nexus between the existence of federal regulations and the purported injury to the plaintiffs caused by the existence of the Wyoming geographical preference laws is also too attenuated to sustain standing.

Having found that the plaintiffs' claims lack standing by reason of the fact that plaintiffs' claims are not fairly traceable

nor are they likely to be redressed by any decision of this Court, the Court need not pursue the remaining claims. The second amended complaint shall be dismissed with prejudice and costs.

### ORDER

Based upon the above and foregoing memorandum opinion, the second amended complaint of plaintiffs' is dismissed with prejudice and with costs herein.